# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DK HOLDINGS, dba DOTCOM HOST,<br><br>                            Plaintiff,<br>v.<br><br>MIVA, INC., et al.,<br><br>                            Defendants. | Case No.:  16-CV-0580 W (AGS)<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AND THIRD CLAIMS FOR RELIEF [DOC. 161];**<br><br>**(2) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S SIXTH CLAIM FOR RELIEF [DOC. 162];**<br><br>**(3) DENYING WITHOUT PREJUDICE MOTION FOR ATTORNEYS' FEES [DOC. 162]; AND**<br><br>**(4) DENYING AS MOOT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE LIMITATION OF LIABILITY PROVISION [DOC. 150]** |

Pending before the Court are: (1) Defendants' motion for partial summary judgment on the first and third claims for relief in the Third Amended Complaint ("TAC") [Doc. 161]; (2) Defendants' motion for partial summary judgment on the sixth

claim for relief in the TAC [Doc. 162]; (3) Defendants' motion for attorneys' fees [Doc. 162]; and (4) Plaintiff's motion for partial summary judgment on the limitation of liability provision in the parties' 2005 agreement. [Doc. 150.] The Court decides the matters on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons that follow, the Court **DENIES** Defendants' motion for partial summary judgment on the first and third claims for relief [Doc. 161], **GRANTS** Defendants' motion for partial summary judgment on the sixth claim for relief [Doc. 162], **DENIES WITHOUT PREJUDICE** Defendants' motion for attorneys' fees [Doc. 162], and **DENIES AS MOOT** Plaintiff's motion for partial summary judgment. [Doc. 150.]

I. **BACKGROUND**

Plaintiff dotCOM Host is an internet hosting business. (*TAC* [Doc. 148] ¶ 13.) It hosts websites by which online retailers sell products to consumers. (*Id.* [Doc. 148] ¶¶ 13–14.)

On April 21, 2005, dotCOM entered into a distribution agreement with Miva, Corporation,[1] a company that creates software used in online retail websites. (*Joint Statement of Undisputed Facts* [Doc. 164] ¶ 1; *Hosting Partner Distribution Agreement* [Doc. 150-7, Exh. 2].) According to the terms of the agreement, dotCOM acquired a limited, non-exclusive right to distribute Miva's software to its retail clients as they made use of dotCOM's web hosting services. (*Joint Statement of Undisputed Facts* [Doc. 164] ¶ 2.) At the time, Miva's software was purchased up-front, via perpetual licensing. (*See Hosting Partner Distribution Agreement* [Doc. 150-7, Exh. 2]; *Joint Statement of Undisputed Facts* [Doc. 164] ¶ 3.)

---

[1] Defendant Miva, Inc., is Miva Corporation's successor in interest. (*Wilson Decl.* [Doc. 162-2] ¶ 9.)

2

16-CV-0580 W (AGS)

By 2009, Miva changed its business model away from offering perpetual software licenses to what is known as software as a service ("SaaS"). (*Joint Statement of Disputed Facts* [Doc. 164] ¶ 4; *Addendum to Agreement* [Doc. 150-8, Exh. 3].)[2] According to the SaaS model, dotCOM would be charged on a monthly basis for its Miva licenses. (*Addendum to Agreement* [Doc. 150-8, Exh. 3].)

Parties entered into an "addendum" agreement in 2009, which would allow Miva to charge dotCOM on a monthly basis for its SaaS software licenses. (*Addendum to Agreement* [Doc. 150-8, Exh. 3].) The monthly licensing model posed new risks for dotCOM that had not been present in the perpetual licensing scheme. Primarily, Miva could have the ability to change its software licensing prices charged to each of its third-party web hosts, thereby exerting a level of control over these distributors that it did not have before.

In an apparent attempt to protect dotCOM from this sort of price discrimination, the 2009 addendum agreement contains the following "most favored nations" clause:

> Should Miva Merchant at any time, during the life of this agreement, sell Miva Merchant licenses, under similar quantity and delivery conditions, to another Host,[3] at prices below those stated herein, Miva Merchant will immediately extend such lower prices to Host.

(*Addendum to Agreement* [Doc. 150-8, Exh. 3] ¶ 1.2.) It also contains a clause that restricts Miva's ability to change its monthly prices without giving 180 days' notice, and it specifies that if Miva cancels the agreement, all of dotCOM's licenses would become perpetual. (*Id.* [Doc. 150-8, Exh. 3] ¶¶ 1.2, 1.5.)

---

[2] Defendants produce no evidence of a genuine dispute here. The SaaS pricing schedule appears in the 2009 Addendum.

[3] "Host" is a defined term within the Addendum, but it refers to dotCOM Host. (*Addendum to Agreement* [Doc. 150-8, Exh. 3] 1.) Its meaning within this sentence is not clear. The Court interprets the word "Host" in this sentence as a generic.

3

In November of 2009 (three months after the execution of the addendum agreement), Miva EVP Rick Wilson sent an email to dotCOM stating that Miva was "getting ready to launch a hosted solution . . . identical to what you offer." (*Daris-Wilson Email Correspondence* [Doc. 150-9, Exh. 76].) It reassured dotCOM that "[i]t's our specific desire to not negatively impact your business and to grow the whole pie," that "you may very well find we become one of the people you get clients from," and that "the partner program is not changing[.]" (*Id.*)

However, approximately one year and three months later, in February of 2011, Miva CEO Russ Carroll sent an email to dotCOM informing it of Miva's purchase of a competing hosting company called Hostasaurus. (*Russ Letter, 2/24/2011* [Doc. 150-10, Exh. 78] (emphasis added).) Miva offered to buy out all of dotCOM's Miva clients, stating, "[y]ou should consider that right now, your portfolio at its peak value [sic] because natural attrition will occur simply by virtue of the fact that by acquiring Hostasaurus, Miva Merchant has acquired the largest specialty host and will be seeking to host all other Miva Merchant stores that we do not currently host . . . ." (*Id.*) Carroll continued, "[f]ailing to come to a deal, if we decide to make future offers, we will subtract Miva Merchant licensing fees from calculations of revenue, which as you are aware are going up." (*Id.*) He stated, "[w]e could just compete for your clients and not offer you another bite at the apple in the form of this offer to purchase your Miva Merchant portfolio. But, instead, we decided to give you this one-time opportunity to sell us your clients at a premium price." (*Id.*)

dotCOM refused Miva's offer. (*Daris Decl.* [Doc. 150-6] ¶ 15.) Thereafter, Miva imposed price increases on dotCOM's monthly SaaS licensing fees. (*Id.* [Doc. 150-6] ¶ 17.) For instance, monthly software licenses that had previously been $40 changed to approximately $1,500. (*Id.*) dotCOM lost half its customers over a short period of time. (*Id.* [Doc. 150-6] ¶ 19.)

//
//

1    Defendants move for partial summary judgment: (1) on Plaintiff's first and third claims for relief, for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq., and for violation of California's Data Access Fraud Act ("CDAFA"), Cal. Penal Code § 502, et seq. [Doc. 161]; and (2) on Plaintiff's sixth cause of action, for breach of contract. [Doc. 162.] Defendants also move for attorneys' fees on behalf of Miva Merchant, Inc. (*Id.*)

Plaintiff moves for partial summary judgment to preclude the application of a limitation of liability clause in the original 2005 agreement between the parties from being applied to the most favored nations clause in the 2009 addendum. [Doc. 150.]

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this "burden of production" in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. See id. at 322–25; Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000) (explaining relevant burden-shifting terminology). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated "to scour the record in search of a genuine issue of triable fact . . . ." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden of production on the motion, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. Anderson, 477 U.S. at 255.

### III. DISCUSSION

#### A. Choice of Law

The 2005 agreement contains a choice of law provision specifying that New York law governs the agreement. (*Hosting Partner Distribution Agreement* [Doc. 150-7, Exh.

2] ¶ 13.6.) The 2009 addendum incorporates this provision.[4] (*Addendum to Agreement* [Doc. 150-8, Exh. 3] 3.)

In briefing the pending motions, parties did not take a clear position on which law applies to the contracts in question. Accordingly, on January 11, 2019, the Court ordered parties to brief the issue. (*Jan. 11, 2019 Order* [Doc. 185].) Parties filed their respective responses on January 18, 2019. (*Pl.'s Response* [Doc. 188]; *Defs.' Response* [Doc. 191].)

"California follows the approach set out in the Restatement (Second) of Conflict of Laws § 187 to determine the law that applies to a contract with a choice-of-law clause." First Intercontinental Bank v. Ahn, 798 F.3d 1149, 1153 (9th Cir. 2015); see Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 466 (1992).

"Under § 187, a California court begins its analysis by determining 'whether the chosen state has a substantial relationship to the parties or their transaction, or . . . whether there is any other reasonable basis for the parties' choice of law.'" Id. (quoting Washington Mut. Bank, FA v. Superior Court, 24 Cal. 4th 906 (2001)). "If this is the case, the court then determines whether California would 'be the state of the applicable law in the absence of an effective choice of law by the parties.'" Id. (citing Restatement (Second) of Conflict of Laws, § 187(2).)

If California would be the state of applicable law in the absence of a choice of law to the contrary, "the court then determines whether the relevant portion of the chosen state's law is contrary to a fundamental policy in California law." First Intercontinental

---

[4] dotCOM takes the position that the 2009 agreement is not, in fact, an addendum of the 2005 agreement, and thus that the choice-of-law provision should not apply to their second agreement with Miva. (*Pl.'s Response* [Doc. 188] 2–3.) This overlooks the following language from the 2009 addendum:

> Except as set forth in this Addendum, the Agreement remains unmodified and in full force and effect. In the event of any inconsistency between the Agreement and this Addendum, this Addendum shall control.

(*Addendum to Agreement* [Doc. 150-8, Exh. 3] 3.) dotCOM identifies no inconsistency here.

7

Bank, 798 F.3d at 1153 (quoting Washington Mut. Bank, FA, 24 Cal. 4th at 916). " 'If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.' " Id. (quoting Nedlloyd Lines B.V, 3 Cal. 4th at 466).

This approach " 'reflect[s] strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses.' " Washington Mut. Bank, FA, 24 Cal. 4th at 917 (quoting Nedlloyd Lines B.V., 3 Cal. 4th at 462). "Accordingly, if the proponent of the clause . . . demonstrates that the chosen state has a substantial relationship to the parties or their transaction, or that a reasonable basis otherwise exists for the choice of law, the parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." Id.

As a preliminary matter, both dotCOM and Miva are California entities. (*See TAC* [Doc. 148] ¶¶ 8–9; *Defs.' Response* [Doc. 191] 2–3.) dotCOM takes the position that the selection of New York law likely served an important interest in ensuring uniformity between Miva's contracts with various hosts inside and outside this state. (*Pl.'s Response* [Doc. 188] 1–2.) On the other hand, Defendants maintain that the selection of New York law is the result of Miva, Inc., having been owned by a parent company in 2005 that retained New York attorneys. (*Defs.' Response* [Doc. 191] 3.) It argues that "the pre-2005, unexecuted agreement between the parties included a *California* choice-of-law provision." (*Id.*) Defendants infer from this that "New York has *no* relationship . . . to the parties or the transaction." (*Id.* [Doc. 191] 2.) On the contrary, the fact that Miva, Inc.'s attorneys negotiated for a New York choice of law provision demonstrates a reasonable basis for the selection of New York law—likely a need for uniformity and familiarity with the law to be applied in the event of a dispute. (*Defs.' Response* [Doc. 191] 2–3.)

8

There is a reasonable basis for the selection of New York law in the contract. See First Intercontinental Bank, 798 F.3d at 1153.

In the absence of the choice-of-law provision, California law would apply.[5] See id. The final issue, then, is whether the selected portions of New York law conflict with fundamental California policy. See First Intercontinental Bank, 798 F.3d at 1153. Without such a conflict, New York law governs the 2005 and 2009 agreements. See Washington Mut. Bank, FA, 24 Cal. 4th at 917 (describing "strong policy considerations favoring the enforcement of freely negotiated choice-of-law rules"); Nedlloyd Lines B.V., 3 Cal. 4th at 468 ("When two sophisticated, commercial entities agree to a choice-of-law clause . . ., the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract.") The existence of a conflict between New York law and California's fundamental public policy is an issue-specific analysis, and the Court will address it as necessary *infra*.

### B. Defendants' Motion as to Computer Hacking

Defendants move for summary judgment on Plaintiff's first and third claims for relief, for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et al., and for violation of California's Data Access Fraud Act ("CDAFA"), Cal. Penal Code § 502, et al. (*Motion for Partial Summary Judgment* [Doc. 161].)

By February of 2016, two of dotCOM's clients had ceased paying their bills—Baar Products and NTX Tools. (*Kolodziej Decl.* [Doc. 169-1] ¶¶ 3–4.) In response, dotCOM kept the clients' websites live, but disabled administrative access and file transfer protocol ("FTP") functionality. Essentially, it allowed the

---

[5] The dispute is being litigated in California by California entities.

9

websites to continue working, but turned off any ability to change what appeared on the sites or to download/transfer the sites to another host. (*Id.*)

These dotCOM clients sought help from Miva, and Miva obliged. (*Wilson Decl.* [Doc. 161-3] ¶ 12; *Kolodziej Decl.* [169-1] ¶ 8[6].) On or about February 1, 2016, Miva used its e-commerce software to load a specially designed module in order to backdoor-access dotCOM's servers, take the clients' data, and transfer it to Miva's servers for its own hosting. (*Id.*)

Defendants now take the position that using Miva's software as a means by which to gain unauthorized access of a competitor's servers on behalf of that competitor's clients cannot constitute a violation of computer hacking laws. They fail to meet their burden of production on this issue.

First, Defendants argue that the clients themselves authorized Miva's access. (*Miva MSJ I* [Doc. 161-1] 8–9.) They do not meet their burden of demonstrating that the clients had authorized access to administrative functionality at the time. See Fed. R. Civ. P. 56(c). dotCOM had prevented the clients from accessing administrative functions on their accounts. Miva undermined this by loading a software module that allowed it to take the clients' data from dotCOM's servers.

Second, Defendants argue that the 2005 agreement gave Miva the right to access its own software, and thus it had authorized access to dotCOM's servers.[7] (*See Miva MSJ I* [Doc. 161-1] 9:5–10:1.) The 2005 agreement cannot reasonably be read as giving Miva the right to use its software as a hacking tool to take data from dotCOM.

Defendants' first motion for partial summary judgment will be denied.

---

[6] Defendants' objections to this paragraph are overruled. (*Defs.' Objs.* [Doc. 172-3] ¶ 3.)

[7] Miva argues that it merely accessed its software, located its own hardware, to move the client data. (*Miva MSJ I* [Doc. 161-1] 9:5–21.) This overlooks the fact that dotCOM is a web host. Miva does not demonstrate the absence of a genuine dispute that the client site data was not, in fact, hosted on dotCOM's servers at the time of the hack. (*Id.* [Doc. 161-1] 6.)

**C. Defendants' Motion as to Breach of Contract**

Defendants move for summary judgment on dotCOM's breach of contract claim for relief.

The motion contains three central arguments. The Court addresses them in turn.

First, Defendants argue that dotCOM cannot prove that Miva breached the most favored nations clause in the addendum agreement. (*Miva MSJ II* [Doc. 162-1] 5:23–6:19.) It takes the position that the clause only prohibits Miva from offering lower prices to third-party hosts, and that because it purchased another host and then sold bundled software along with that host's services, it had the contractual right to offer differential pricing on the software. (*Id.*) dotCOM, on the other hand, argues that Miva breached the clause by selling its monthly software licensing in a package along with a separate entity's hosting services at lower rates than it offered dotCOM for the software licensing. (*Miva MSJ Opp'n II* [Doc. 170] 2–4.)

Once again, the most favored nations provision reads as follows:

> Should Miva Merchant at any time, during the life of this agreement, sell Miva Merchant licenses, under similar quantity and delivery conditions, to another Host, at prices below those stated herein, Miva Merchant will immediately extend such lower prices to Host.[8]

(*Addendum to Agreement* [Doc. 150-8, Exh. 3] ¶ 1.2.)

"A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations." Givati v. Air Techniques, Inc., 960 N.Y.S. 2d 196, 198 (2013) (citing St. John's Univ.,

---

[8] As detailed above, "Host" is nominally a defined term, but it has no applicable definition in this context.

N.Y. v. Butler Rogers Baskett Architects, P.C., 938 N.Y.S. 2d 578 (2012)). "In so doing, a court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." Id. "Instead, 'the entire contract must be reviewed and [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought[.]' " Id. (quoting Riverside S. Planning Corp. v. CRP/Extell Riverslide, L.P., 892 N.Y.S. 2d 303 (2009) (internal quotation omitted)).[9]

The initial question is whether Defendants have demonstrated the absence of a genuine dispute that Miva's selling software licenses to clients bundled with a Miva-owned third-party web host's services cannot constitute "sell[ing] Miva Merchant licenses, under similar quantity and delivery conditions, to another [h]ost, at prices below those stated herein . . . ." (*Addendum to Agreement* [Doc. 150-8, Exh. 3] ¶ 1.2.) The Court answers in the affirmative.

Shortly after executing the most favored nations clause, Miva acquired a web host, Hostasaurus, newly named Miva Merchant, Inc.—a Florida corporation. (*Addendum to Agreement* [Doc. 150-8, Exh. 3] ¶ 1.2; *Wilson Decl. I* [Doc. 162-2] ¶ 5.) Miva kept the newly acquired Miva Merchant, Inc., solely a web host, and it bundled hosting services with Miva SaaS licenses to sell to the new host's clients at discounted rates relative to the SaaS licensing fees it was then charging dotCOM. (*Wilson Decl. I* [Doc. 162-2] ¶ 6; *Wilson Decl. II* [Doc. 173-1] ¶ 4; *Kolodziej Decl.* [Doc. 170-9] ¶ 2 ("Miva offered dotCOM client Wetsuit Warehouse a price of $1,046 for hosting and the Miva license . . .

---

[9] Defendants do not establish a conflict between this New York law and a fundamental public policy of California. See First Intercontinental Bank, 798 F.3d at 1153; Washington Mut. Bank, FA, 24 Cal. 4th at 917. New York law applies here per the parties' choice-of-law provision in the 2005 contract. (*Hosting Partner Distribution Agreement* [Doc. 150-7, Exh. 2] ¶ 13.6.) See Part III.A., *supra*.

. Miva charged dotCOM $1,450 just for the license fee for enterprise-level clients like Wetsuit Warehouse."); *Miva-Wetsuit Warehouse Email Chain* [Doc. 170-7, Exh. 95].)

By selling licenses directly to clients hosted by Miva Merchant, Inc., Miva circumvented the most favored nations clause. (*Wilson Decl. II* [Doc. 173-1] ¶ 4.) But it did not breach it. Even viewing the evidence in the light most favorable to the nonmoving party, Matsushita, 475 U.S. at 587, there is no genuine dispute that this arrangement did not involve Miva selling software licenses to another host. Miva's dealings with Miva Merchant, Inc. and its customers fall outside the ambit of the clause. (*Addendum to Agreement* [Doc. 150-8, Exh. 3] ¶ 1.2 (proscribing sales to another host).)

In opposition, Plaintiff contends that Defendants also breached the most favored nations clause by offering preferential lower rates to other third-party web hosts in 2016. (*Wilson Decl.* [Doc. 170-2, Exh. 1] 179, 296–99; *Kolodziej Decl.* [Doc. 170-9] ¶ 3; *New Pricing Schedule for Other Hosts* [Doc. 170-8, Exh. 133].) The operative complaint alleges nothing of this theory. As the allegations of breach discussed above are the only ones appearing in the TAC, they are the only ones for which Defendants have been put on notice. (*TAC* [Doc. 148] ¶¶ 93–102.) See Fed. R. Civ. P. 8. Thus, they are the only allegations of breach of contract properly considered in the context of an opposition to a motion for partial summary judgment. See James v. Dependency Legal Grp., 253 F. Supp. 3d 1077, 1091 (S.D. Cal. 2015) (Battaglia, J.); Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968–69 (9th Cir. 2006). The Court may not consider Plaintiff's argument as to another, separate breach at this stage of the proceedings.

The motion for partial summary judgment as to the breach of contract claim will be granted. See Fed. R. Civ. P. 56.

### D. Defendants' Motion for Attorneys' Fees

In one short paragraph that appears as part of its motion for summary judgment on the breach of contract claim, Defendants move for attorneys' fees on behalf of Miva Merchant, Inc. (*Miva MSJ II* [Doc. 162-1] 11:1–11.) They seek to enforce the attorneys'

fees clause in the 2005 software licensing agreement—to which Miva Merchant, Inc. was not a party—on the basis that "the California Supreme Court has held that California Civil Code Section 1717(a)'s fee mutuality extends to nonsignatory defendants." (*Id.* (citing Reynolds Metals Co. v. Alperson, 25 Cal. 3d 124, 128 (1979)).[10]

The attorneys' fees clause in the 2005 agreement reads as follows:

> 13.8 <u>Attorneys' Fees</u>. In the event either party files any action in any court of law to enforce any provision of this Agreement, or to request a judicial interpretation of any terms of this agreement, the party deemed the prevailing party in such action shall be entitled, in addition to any damages which may be awarded, to receive reasonable attorneys' fees as adjudged by the court.

(*Hosting Partner Distribution Agreement* [Doc. 150-7, Exh. 2] ¶ 13.8.)

However, as Plaintiff points out in opposition, Miva Merchant, Inc., is a party to more than merely the breach of contract claim for relief. (*TAC* [Doc. 148]; *Miva MSJ Opp'n II* [Doc. 170] 5–6.) Defendants do not show that Miva Merchant, Inc. is the prevailing party in this action. (*Hosting Partner Distribution Agreement* [Doc. 150-7, Exh. 2] ¶ 13.8.) In fact, in the one short paragraph they dedicate to their fees motion on reply, Defendants appear to abandon the issue:

> With respect to attorney's fees, as set forth in the moving papers, Miva Merchant, Inc. intends to file a separate motion seeking said fees should Miva Merchant, Inc. prevail. What law applies will be briefed and argued then. For now, the issue is that Miva Merchant, Inc. is not a party to the contract.

---

[10] Parties do not dispute that this is an area of law in which New York and California law differ, and in which New York law would be contrary to fundamental California policy. (*Pl.'s Response* [Doc. 188] 2; *Defs.' Response* [Doc. 191] 4.) Hence, California law applies to this issue. See First Intercontinental Bank, 798 F.3d at 1153, 1157.

14

(*Miva MSJ II Reply* [Doc. 173] 10:4–7.) It is too soon to decide whether Miva Merchant, Inc. should be deemed the prevailing party in this action. The motion for attorneys' fees is premature. It will be denied without prejudice.

### E. Plaintiff's Motion as to the Limitation of Liability Provision

Plaintiff moves for partial summary judgment to preclude application of the limitation of liability provision in the 2005 agreement to the most favored nations provision in the 2009 addendum—on which the breach of contract claim is grounded. (*Pl.'s MSJ* [Doc. 150] ("dotCOM Host . . . move[s] for partial summary judgment . . . that the 'limitation of liability' provision of the parties' 2005 agreement does not preclude or limit dotCOM [H]ost's ability to recover damages for breach of the 'most favored nations' provision of the parties' 2009 agreement."); *TAC* [Doc. 148] ¶¶ 93–102.)

In light of the dismissal of the breach of contract claim, this motion will be denied as moot.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

## IV. CONCLUSION & ORDER

Defendants' motion for partial summary judgment on Plaintiff's first and third claims for relief is **DENIED**. [Doc. 161.]

Defendants' motion for partial summary judgment on Plaintiff's sixth claim for relief is **GRANTED**. [Doc. 162.]

Defendants' motion for attorneys' fees is **DENIED WITHOUT PREJUDICE**. [Doc. 162.]

Plaintiff's motion for partial summary judgment on the limitation of liability provision is **DENIED AS MOOT**. [Doc. 150.]

**IT IS SO ORDERED.**

Dated: January 23, 2019

Hon. Thomas J. Whelan
United States District Judge